## No. 13,338.

COLORADO-NEW MEXICO WOOL MARKETING ASSOCIATION *v.*
MANNING, SHERIFF.
(40 P. [2d] 972)

Decided January 21, 1935.

Messrs. McHENDRIE, SHATTUCK & POINTER, for plaintiff in error.

Mr. JAMES T. LOCKE, Mr. O. P. RAY, for defendant in error.

*En Banc.*

Mr. Chief Justice Butler delivered the opinion of the court.

The Colorado-New Mexico Wool Marketing Association sued Mel H. Manning, as sheriff of Custer county, to recover possession of certain wool. Judgment going against it, the association brought the case here for review.

On June 12, 1930, Eric R. McKellar and John McKellar, copartners doing business under the firm name of McKellar Brothers, were engaged in the business of growing wool. Some of the sheep were owned by them, and, in the others they had a contract interest. On that date they entered into a cooperative marketing agreement with the association. It contains the following, among other, provisions:

"The Association buys and the Grower sells to the Association all wool * * * produced by or for him * * *, and the Grower agrees to deliver all such wool * * * at such place or places as the Association may direct. This contract is intended by the parties to pass an absolute title to all such wool * * * as soon as the same has a potential existence but shall be at the risk of Grower until delivery * * *.

"All wool * * * shall be delivered at the earliest reasonable time after shearing, to such points as the Association may direct but shall be at the risk of the Grower until delivery."

Shortly prior to June 10, 1931, the sheep were sheared and the wool was placed in one of the ranch buildings. There is no evidence that the association had as yet directed where the wool should be delivered. On that date Manning, as sheriff, seized the wool under a writ of attachment issued in an action brought against McKellar Brothers by the New England Ranch and Oil Corporation.

Due to the remarkable character of the agreement, its construction has not been free from difficulty.

Evidently the draftsman had in mind, and adopted provisions from, three different kinds of contract; namely: (1) A contract whereby a grower gives an association, as factor or broker, the exclusive right to sell all the wool produced by the grower; (2) an executory contract *to* sell; and (3) a contract *of* sale. Throughout, there is confusion. The first part of the provision quoted above would seem to indicate that the parties intended a present sale. But the meaning of the provision that absolute title should pass as soon as the wool has a potential existence is not clear. Wool growing or to be grown on sheep that the seller owns or in which he has an interest has a potential existence. Such property is the subject of sale and, upon sale, title passes when the property comes into actual existence. The provision just referred to would seem to indicate that the sale, or attempted sale, was made before the wool had a potential existence and that it was intended that title should pass as soon as it had a potential existence. Such an attempted sale would be ineffective. But other provisions indicate that the wool already had potential existence at the time the agreement was made. The provision that the wool should be delivered to such points as the association might direct, coupled with the provision that the wool should be at the grower's risk until delivery, would seem to negative the passing of title until delivery at the place or places designated by the association. But there is no evidence that the association designated any place of delivery, or that there was any delivery to the association at any time or place. There are other provisions that tend to negative the passing of title. Thus, the grower agrees that the association may sell the wool delivered to it, may borrow money on it, may commingle it with other wool, and may exercise all other rights of ownership over it. If this was an absolute sale and title passed to the association, why these provisions? The association authorizes the grower to mortgage the wool, "subject to the prior right of the association thereto." If the as-

sociation owned the wool, why this provision? Furthermore, on December 3, 1930, the association advanced to McKellar Brothers $1,950, taking their promissory note for that amount payable to the association in nine months with interest at 6 per cent per annum. At that time a written agreement was made. It referred to the marketing agreement and to the making of the advance of $1,950. It states: "This conveyance, however, is intended as a mortgage on all the wool * * * from the above mentioned sheep * * *, more particulaly described as follows:" Here follows the description. This agreement was acknowledged and recorded as a chattel mortgage.

Upon consideration of all the circumstances, we conclude, and hold, that at the time of the attachment levy title to the wool had not passed to the association, but was in McKellar Brothers, the defendants in the attachment suit.

But it is said that if the association is not the owner of the wool, it is the mortgagee, and as such is entitled to the possession of the wool. Manning contends that although the association may be entitled to possession as against McKellar Brothers, as to the attachment creditor the chattel mortgage is unenforceable for several reasons, only one of which requires consideration.

When the chattel mortgage was executed, and at all times thereafter, the sheep were kept on the McKellar ranch. That ranch is in practically a compact body and lies partly in Fremont county and partly in Custer county. There is a fence around the entire ranch, but there is no fence separating that part of the ranch lying in the former county from that part lying in the latter county, and the sheep were permitted to roam about the ranch at will. The corrals and the sheds and other buildings all are in Custer county. The shearing was done in Custer county, and the wool was stored in one of the ranch buildings, where it was seized under the attachment writ by Manning, as sheriff of Custer county. The chattel mortgage was recorded in Fremont county, but not in Custer

190

county. The locus of the property is thus stated in the mortgage: "* * * all the wool * * * from the above mentioned sheep * * *. Said sheep * * * now being located in the pasture of the Grower, situated 17 miles in a South East direction from Canon City, the County seat of Fremont county." Not that the sheep are in Fremont county, but that they are on the grower's ranch, and that ranch is 17 miles southeast of Canon City, and that city is the county seat of Fremont county. The ranch, as we have seen, is in two counties, Fremont and Custer.

There is some evidence to the effect that when the mortgage was given the sheep were on that part of the ranch that lies in Fremont county. However, John McKellar testified as follows: "Q. Now in their ranging at that time—if they were turned loose, there was nothing to hinder them from going into either county, was there? A. No, sir. Q. And the fact was that the sheep were usually ranging in both counties during the ranging period? A. No, *mostly* in Fremont county, because that was used in the winter time; the snow would lie more on the Custer county end, and so we *usually* had them north in the winter, which would be in the Fremont county end, to get away from the snow. Q. But it wasn't always strictly observed in that way, was it? A. Oh, no, no." The money was advanced to enable the McKellars to pay the expenses incident to shearing, and John McKellar testified that at the time the sheep were sheared "they were being ranged all over." The shearing was done at the buildings in Custer county. It will be observed that the mortgage was on wool "from" not "on," the sheep. In other words, it was on wool severed from the sheep. The wool was severed from the sheep in Custer county, and was stored there until it was seized by the sheriff of that county.

In view of all the circumstances disclosed by the record, we conclude that the mortgage should have been recorded in Custer county, and that as it was not recorded

there, it is unenforceable as against the attachment creditor and the sheriff.

There are other assignments of error, but we need not discuss them.

The judgment is affirmed.

MR. JUSTICE CAMPBELL dissents.